# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

————

Argued April 6, 2018                    Decided July 31, 2018

No. 15-1098

VERSO CORPORATION,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

MARQUETTE BOARD OF LIGHT AND POWER, ET AL.,
INTERVENORS

————

Consolidated with 16-1205, 16-1212, 16-1226, 16-1228,
16-1385, 16-1388, 16-1389, 16-1391, 16-1397, 16-1404

————

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

————

*David W. D'Alessandro* argued the cause for petitioner Michigan Public Service Commission. *William F. Demarest Jr.* argued the cause for petitioners Tilden Mining Company L.C. and Empire Iron Mining Partnership. With them on the joint briefs were *Kelly A. Daly*, *M. Denyse Zosa*, *Steven A. Neeley Jr.*, *Sylvia J.S. Bartell*, *Lauren D. Donofrio*, Assistant Attorney General, Office of the Attorney General for the State

2

of Michigan, *Jennifer U. Heston*, *Saulius K. Mikalonis*, *Christopher R. Jones*, *Elizabeth W. Whittle*, *Thomas J. Waters*, *Christine C. Ryan*, *Phyllis G. Kimmel*, *Robert C. Fallon*, and *Andrew B. Young*. *Steven D. Hughey*, Assistant Attorney General, Office of the Attorney General for the State of Michigan, *Francis A. Taylor Jr.*, and *A. Hewitt Rose III*, entered appearances.

*Holly E. Cafer*, Senior Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *James P. Danly*, General Counsel, *Robert H. Solomon*, Solicitor, and *Nicholas M. Gladd*, Attorney.

*William L. Massey* argued the cause for intervenor Public Service Commission of Wisconsin. On the joint brief of intervenors were *Cynthia S. Bogorad*, *David E. Pomper*, *Rory McGarry*, *Justin M. Vickers*, *Regina Y. Speed-Bost*, and *Debra Ann Palmer*.

Before: ROGERS, SRINIVASAN and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*: In *Louisiana Public Service Commission v. Federal Energy Regulatory Commission*, this Court affirmed FERC's denial of refunds in a cost-allocation case, upholding its discretion to deny refunds where a flaw in rate design caused the costs to be borne disproportionately among customers. *See* 883 F.3d 929 (D.C. Cir. Mar. 6, 2018). This case presents a similar scenario with an opposite result: here, after finding the rate-distribution methodology unjust and unreasonable upon a Section 206 complaint, FERC ordered refunds to customers who paid too much, funded by surcharges

3

on customers who paid too little.  Petitioners – who were subjected to surcharges – challenge FERC's orders as violating the filed-rate doctrine and the prohibition on retroactive rate increases.  They also argue that FERC's decisions were supported by insufficient evidence and that FERC's reliance on the evidence it did employ was arbitrary and capricious.

We conclude that the reallocation at issue here does not constitute an impermissible retroactive rate increase.  FERC reasonably determined that the prior rate methodology was unjust and unreasonable, and its reliance on certain evidence in reaching this conclusion was appropriate.  Having established that the existing rate was unjust and unreasonable, and having determined that a different methodology would comply with cost-causation principles, FERC had authority to order refunds and corresponding surcharges under Section 206 and its broad remedial authority under Section 309.  Accordingly, we deny the Petitions for review.

I.

This case involves system support resource ("SSR") costs in the territory of the American Transmission Company ("ATC") under the Midcontinent Independent System Operator, Inc. ("MISO") Tariff.  To ensure system stability, MISO requires energy producers in its territory to notify MISO prior to ceasing operation.  MISO then evaluates the importance of the would-be retired facility and may require continued operation if necessary for the reliability of energy supply.  Such providers are designated SSRs, and they are compensated for the cost of continued operation under SSR agreements with MISO.

For most of the MISO service area, SSR costs have long been shared by customers based on the load served.  *Midwest*

4

*Indep. Transmission Sys. Operator, Inc. Pub. Utils. with Grandfathered Agreements in the Midwest Iso Region*, 108 FERC ¶ 61,163, ¶ 61,968, P 372 (Aug. 6, 2004). Under this allocation methodology, each load-serving entity ("LSE") pays for the reliability resources in proportion to its reliability needs.

For the ATC area, however, the MISO Tariff allocated SSR costs pro rata among all customers. *See id.* at P 368. FERC originally approved the ATC pro rata allocation as part of the separate tariff for ATC's territory in Michigan's Upper Peninsula and Wisconsin. *See Wis. Elec. Power Co. Am. Transmission Co., LLC Madison Gas & Elec. Co. Wis. Pub. Serv. Corp. Wis. Power & Light Co.*, 97 FERC ¶ 61,337, ¶ 62,582 & n.4 (Dec. 21, 2001). However, FERC incorporated ATC into the MISO system around the same time that it approved ATC's SSR-cost-allocation methodology. *See Am. Transmission Co., LLC*, 97 FERC ¶ 62,182, ¶ 64,269 (Nov. 28, 2001). The MISO Tariff continued the pro rata allocation methodology for the ATC area after it became part of MISO. Specifically, Section 38.2.7.k of the Tariff provided that "any costs of operating an SSR Unit allocated to the footprint of [ATC] shall be allocated to all LSEs within the footprint of [ATC] on a *pro rata* basis." *See Midcontinent Indep. Sys. Operator, Inc. Pub. Serv. Comm'n of Wis.*, 148 FERC ¶ 61,071, ¶ 61,443, P 12 (July 29, 2014) ("July 29, 2014 Order"). Only the ATC area was subject to such a specified methodology: for the rest of the MISO area, the Tariff provided only that reliability costs were allocated to the LSEs "which require[] the operation" of reliability resources. *Id.* at P 18. In other words, SSR costs for all non-ATC service areas were allocated to the LSEs that actually benefited from the reliability resources.

The instant Petitions arise from SSR agreements regarding three facilities in the ATC service area. MISO filed the first

5

SSR agreement using the ATC pro rata allocation in October 2012, for the continued operation of a City of Escanaba, Michigan facility, which FERC accepted. *See Midwest Indep. Transmission Sys. Operator, Inc.*, 142 FERC ¶ 61,170, ¶ 61,812, P 11 (Mar. 4, 2013). In early 2014, MISO filed an SSR agreement requiring the continued operation of a Presque Isle facility located in Marquette, Michigan, with costs allocated to customers pro rata. FERC accepted the proposed Presque Isle SSR Agreement on April 1, 2014. *Midcontinent Indep. Sys. Operator, Inc.*, 147 FERC ¶ 61,004, ¶ 61,013, PP 5, 12 (Apr. 1, 2014). MISO also submitted an SSR agreement regarding the continued operation of a White Pine Electric Power, LLC unit, which FERC accepted on June 13, 2014. *Midcontinent Indep. Sys. Operator, Inc.*, 147 FERC ¶ 61,199, ¶ 62,114, PP 1, 3, 11 (June 13, 2014).

On April 3, 2014, two days after FERC accepted the Presque Isle SSR Agreement, the Public Service Commission of Wisconsin ("Wisconsin Commission" or "PSCW") filed a complaint under Section 206 of the Federal Power Act, 16 U.S.C. § 824e, to challenge the allocation of the Presque Isle SSR costs as unjust and unreasonable. The Complaint relied on a study that MISO conducted, at the request of stakeholders, to assess which load-serving entities in the ATC footprint actually benefited from the continued operation of the Presque Isle facility. PSCW Complaint at 3 & n.8, FERC Docket No. EL14-34-000 (Apr. 3, 2014). The preliminary load-shed analysis showed that 42 percent of the benefiting load of the Presque Isle facility was in Wisconsin; however, the MISO Tariff assigned 92 percent of the SSR costs to Wisconsin ratepayers based on the pro rata allocation methodology. *Id.* at 3-4.

On July 29, 2014, FERC granted the Wisconsin Commission's Complaint. *See* July 29, 2014 Order, 148 FERC

6

¶ 61,071.  FERC concluded that the Wisconsin Commission "met its burden . . . to show that the ATC *pro rata* cost allocation provision in MISO's Tariff is unjust, unreasonable, unduly discriminatory, or preferential because . . . it does not follow cost causation principles."  *Id.* at P 59.  Relying on the preliminary load-shed study, FERC reasoned that the pro rata allocation "would allocate 92 percent of the Presque Isle SSR costs to LSEs located in Wisconsin even though . . . such LSEs only receive 42 percent of the reliability benefit."  *Id.* at P 61.  This evidence "demonstrat[ed] that the methodology d[id] not reflect a proper allocation of costs."  *Id.*  FERC explained that the "preliminary nature of the load-shed study" was not problematic for its analysis because the data showed that "the current ATC *pro rata* cost allocation [] bears little, if any, relation to the benefits provided" from the reliability agreement.  *Id.*

By way of remedy, the July 29, 2014 Order directed MISO to remove the pro rata provision from the Tariff, "thereby extending to the ATC footprint the general SSR cost allocation Tariff language, which requires MISO to allocate SSR costs to 'the LSE(s) which require(s) the operation of the SSR Unit for reliability purposes.'"  July 29, 2014 Order, 148 FERC ¶ 61,071, P 66.  FERC further determined that the assessment encapsulated in the preliminary load-shed study was appropriate, but required MISO to submit a final load-shed study within 30 days.  *Id.*  Finally, and most critically for this Petition, FERC ordered refunds to reallocate the SSR costs in the ATC footprint dating from the filing of the Section 206 Complaint.  *Id.* at P 68.

Within weeks, FERC also addressed the Escanaba and White Pine SSR Agreements that similarly allocated costs on a pro rata basis.  *See Midcontinent Indep. Sys. Operator, Inc.*, 148 FERC ¶ 61,116, P 12 (Aug. 12, 2014) ("Escanaba Initial

7

Order"); *Midcontinent Indep. Sys. Operator, Inc.*, 148 FERC ¶ 61,136, P 7 (Aug. 21, 2014) ("White Pine Initial Order"). FERC directed MISO to conduct load-shed studies and submit revised proposals allocating the costs of continued operation of each of these units in accordance with the results.  Escanaba Initial Order, 148 FERC ¶ 61,116, P 37; White Pine Initial Order, 148 FERC ¶ 61,136, P 44.  FERC also ordered refunds dated to April 16, 2014, for White Pine and June 15, 2014, for Escanaba.  *See Pub. Serv. Comm'n of Wis.*, 156 FERC ¶ 61,205, P 12 (Sept. 22, 2016) ("September 22, 2016 Order").

MISO completed a second load-shed study as directed by the July 29, 2014 Order and submitted compliance filings regarding each of the three SSR facilities.  *Pub. Serv. Comm'n of Wis.*, 150 FERC ¶ 61,104, PP 8-9, 12-13, 15-16 (Feb. 19, 2015) ("February 19, 2015 Order").  The second load-shed study attributed approximately 86 percent of the SSR benefits to Local Balancing Authorities ("LBAs") located in Wisconsin. *See* J.A. 984-85.  These results were far closer to the original allocation – where 92 percent of the costs were allocated to Wisconsin customers – than were the results of the preliminary load-shed study upon which the Wisconsin Commission Complaint and the July 29, 2014 Order relied.

FERC reviewed the compliance filings, among other proceedings, in an order dated February 19, 2015.  *See Pub. Serv. Comm'n of Wis.*, 150 FERC ¶ 61,104.  In the February 19, 2015 Order, FERC reaffirmed its prior finding that MISO's pro rata allocation of SSR costs in the ATC area was unjust, unreasonable, unduly discriminatory, or preferential under Section 206 of the Federal Power Act.  *Id.* at P 2.  During this time, MISO divided one of the LBAs that spanned areas of Michigan and Wisconsin to "provid[e] a more granular identification of reliability events in the Wisconsin-Michigan boundary area."  MISO Tariff Filing at 2, FERC Docket No.

8

ER14-2952 (Sept. 26, 2014), J.A. 1163; *see also* Feb. 19, 2015 Order, 150 FERC ¶ 61,104, PP 17-18.  Accounting for the newly divided LBAs, approximately 99 percent of the reliability benefits were attributed to Michigan LSEs, while Wisconsin LSEs received the remaining 1 percent.  Feb. 19, 2015 Order, 150 FERC ¶ 61,104, P 19.  FERC determined that MISO's proposed reallocation based on LBA boundaries "can produce results that are not consistent with MISO's Tariff or cost causation principles by failing to allocate SSR costs to the LSEs that benefit from those SSR Units."  *Id.* at P 2.  Accordingly, FERC required further compliance filings allocating the costs from the Presque Isle, White Pine, and Escanaba SSR Units to the benefitting LSEs directly.  *Id.*  This required MISO to revise its study methodology to identify the LSEs relying on the SSR resources.  *Id.* at P 113.  By order dated May 3, 2016, FERC accepted MISO's revised SSR-cost-allocation methodology and ordered MISO to prepare a refund report describing how MISO would effectuate that methodology in the previously ordered refunds.  *Midcontinent Indep. Sys. Operator, Inc.*, 155 FERC ¶ 61,134, P 37 (May 3, 2016).

On September 22, 2016, FERC issued the final order under review in these Petitions.  *See* Sept. 22, 2016 Order, 156 FERC ¶ 61,205.  FERC denied requests for rehearing of its decision to order refunds for the Presque Isle, White Pine, and Escanaba SSR costs from April 3, 2014, April 16, 2014, and June 15, 2014, respectively.  *Id.* at P 40.  Turning to the remedy, FERC explained that it "ha[d] established a policy of not ordering refunds in rate design and cost allocation cases," but this policy "is not a strict requirement in every cost allocation case."  *Id.* at PP 41, 43.  Instead, FERC's approach would vary based on equitable considerations.  "[P]rimary" bases disfavoring refunds include "the unfairness that results from retroactive implementation of a new rate for both utilities and customers

9

who cannot alter their past actions in light of that new rate, and [] the potential for under-recovery." *Id.* at P 44. FERC reasoned that "neither of these grounds applies here," because no party "identified any particular decisions made in reliance on the previous SSR cost allocation methodology," and "MISO can calculate the exact amount of SSR costs that should be assessed to each LSE that underpaid in order to refund LSEs that overpaid," based on its records. *Id.* at PP 45-47. Accordingly, FERC concluded, the equitable considerations with respect to the three SSR units at issue "require a narrow exception to the Commission's general policy of not providing refunds in a cost allocation case." *Id.* at PP 50-51. FERC ordered that the refunds "will be implemented through surcharges to LSEs that paid too little under the previous methodology." Sept. 22, 2016 Order, 156 FERC ¶ 61,205, P 51.

Petitioners – customers "that paid too little" and are now subject to surcharges – challenge FERC's authority to impose surcharges as part of its remedy, contending that it amounts to an impermissible retroactive rate increase. They also contend that FERC's decision was arbitrary and capricious because the difference between the allocation rejected and the allocation ultimately approved was insignificant.

## II.

"Under the Federal Power Act, [FERC] must ensure that all rates charged for the transmission or sale of electric energy are 'just and reasonable.'" *Maine v. Fed. Energy Regulatory Comm'n*, 854 F.3d 9, 15 (D.C. Cir. 2017) (quoting 16 U.S.C. § 824e(a)). The scope of judicial review of such determinations is "narrow": courts afford "great deference" to FERC's rate decisions, and we "may not substitute our own judgment for that of the Commission." *Fed. Energy*

10

*Regulatory Comm'n v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 782 (2016).  That said, a reviewing court must "at least assure itself that the Commission's reason for its decision is both rational and consistent with the authority delegated to it by Congress."  *Xcel Energy Servs. Inc. v. Fed. Energy Regulatory Comm'n*, 815 F.3d 947, 952 (D.C. Cir. 2016).  The courts review FERC's decisions under the familiar arbitrary-and-capricious standard of the Administrative Procedure Act, and this review requires "a reasoned explanation" "where an agency departs from established precedent." *Transmission Agency of N. Cal. v. Fed. Energy Regulatory Comm'n*, 495 F.3d 663, 672 (D.C. Cir. 2007); *see* 5 U.S.C. § 706.

A.

Petitioners challenge FERC's determination that the pro rata methodology for distributing SSR costs was unjust and unreasonable, contending that there was no new evidence or change in circumstances to justify this conclusion, that the results of the final load-shed study undermined FERC's reasoning, and that FERC "fail[ed] to consider the historical basis" for that methodology, such that its orders lacked reasoned decision-making.  Pet'rs' Br. 48-55.  None of these objections is persuasive.

FERC must undertake a two-step inquiry regarding a Section 206 challenge.  *See Maine*, 854 F.3d at 21. The first step involves reviewing the rate subject to a Section 206 complaint to determine whether it is unjust, unreasonable, unduly discriminatory, or preferential.  *Id.* (citing 16 U.S.C. § 824e(a)).  "Only *after* having made the determination that the utility's existing rate fails that test may FERC exercise its section 206 authority to impose a new rate." *Id.*  In the orders now under review, FERC followed this process – first

11

determining that the existing allocation was problematic before considering a replacement. At the time of the Wisconsin Commission's Complaint and the July 29, 2014 Order granting it – in other words, during the first step of the Section 206 process – FERC had before it only the preliminary load-shed study. The preliminary data showed that the Wisconsin customers received 42 percent of the reliability benefit of the SSR facilities, despite being allocated 92 percent of the costs.

Petitioners contend that the preliminary load-shed study is not sufficient to support FERC's conclusion that the existing rate is unreasonable because the study merely confirmed the difference between a load-shed methodology and the pro rata methodology. Pet'rs' Br. 41-45.

Contrary to Petitioners' view, FERC's determination that the pro rata methodology was unjust and unreasonable relied on new information not previously before the Commission. In one sense, the eventuality that two different methodologies would yield different results was reasonably known to the parties and FERC during the initial decision that the pro rata methodology was just and reasonable. But just because some difference between the results of these two methodologies is predictable does not make the information actually collected any less telling. *See OXY USA, Inc. v. Fed. Energy Regulatory Comm'n*, 64 F.3d 679, 690 (D.C. Cir. 1995) (explaining that "[no] finding of unforeseeability is required before the Commission may reach the conclusion that a rate that was previously just and reasonable is no longer so"). The preliminary load-shed evidence demonstrated a sizable gap between the benefits accrued by each LSE and the allocated cost, supporting FERC's determination that the pro rata methodology did not comport with cost-causation principles. And the actual data underlying FERC's consideration was not before it in prior proceedings regarding the ATC

12

SSR-cost-allocation methodology.  As the February 19, 2015
Order noted, MISO did not previously require load-shed
studies for SSR units in the ATC area – there was no need for
this information in light of the pro rata allocation.  *See* Feb. 19,
2015 Order, 150 FERC ¶ 61,104, PP 12, 15.  In any event, the
preliminary load-shed study regarding the Presque Isle,
Escanaba, and White Pine units was new information about
newly designated SSRs.  That MISO could have collected
similar information before designating these support resources
does not detract from the new information available through
the load-shed data underlying the Complaint, upon which
FERC relied.

     We also are unpersuaded by Petitioners' argument that the
final load-shed study defeats FERC's conclusion that the pro
rata methodology was unjust and unreasonable.  Petitioners
point out that, according to the second study, the pro rata
methodology was off by only about 6 percent with respect to
the benefits received by Michigan and Wisconsin respectively.
As an initial matter, the load-shed study that FERC actually
accepted showed that the pro rata methodology was an order of
magnitude more inaccurate than the second study had revealed:
the pro rata methodology was off not by 6 percent, but by 91
percent.  In any event, Petitioners' assertion that a 6 percent
difference is insufficient to show that the pro rata methodology
is unreasonable lacks support.  *See* Pet'rs' Br. 46.
And Petitioners failed to preserve this point, as they did not
argue before the Commission that the final load-shed data
undermined a finding that the pro rata methodology was
outside of the zone of reasonableness.  *See* 16 U.S.C. § 825*l*(b).
Moreover, since FERC did not rely on a
zone-of-reasonableness analysis, this challenge is inapt:  a rate
may be shown to be unreasonable under Section 206 even
without a showing that the rate is entirely outside the zone of
reasonableness.  *See Maine*, 854 F.3d at 24 ("While showing

13

that the existing rate is entirely outside the zone of
reasonableness may illustrate that the existing rate is unlawful,
that is not the *only* way in which FERC can satisfy its burden
under section 206.").   In addition, whether 6 percent is
significant for the reasonableness analysis is a policy question
for FERC to decide:   Petitioners point to no precedent or
evidence to suggest that such a difference could not be
significant for the purposes of the Federal Power Act.   Also
unavailing is Petitioners' position that the difference between
the results of the preliminary load-shed study and the final
study call into question the validity of the evidence.   FERC's
recognition that more accurate data was necessary does not
undermine its reliance on the preliminary study at the time of
the Complaint, or on the final data once the study was
complete.   Petitioners identify no support for the proposition
that FERC cannot rely on different evidence at each step of the
Section 206 inquiry.

Finally, we reject Petitioners' contention that FERC failed
to take into account the historical rationale for the ATC
carve-out.   *See* Pet'rs' Br. 48-53.   To the contrary, FERC
acknowledged the origins of the pro rata methodology as
springing from ATC's cost-sharing philosophy and explained
its conclusion that ATC's "original intent" in sharing costs was
"not served by the *pro rata* sharing of SSR costs . . . because
decisions concerning the operational status of . . . generation
assets are not subject to the ATC transmission planning
process."   July 29, 2014 Order, 148 FERC ¶ 61,071, P 65.
FERC further addressed the historical basis for the ATC's pro
rata allocation in its February 19, 2015 Order, reasoning that
the new evidence related to cost causation undermined the
propriety of that vestigial methodology.   *See* Feb. 19, 2015
Order, 150 FERC ¶ 61,104, P 76.   That FERC rejected
then-protesters' position – twice – does not mean that it failed
to consider it.   Accordingly, we defer to FERC's rate allocation

14

determination as supported by substantial evidence and reasoned decision-making.

B.

Having concluded that FERC reasonably determined that the pro rata allocation was unjust and unreasonable under Section 206, we turn to Petitioners' challenge relating to remedy.

Petitioners posit that the ordered surcharges effect a retroactive rate increase, violating Section 206 and the filed-rate doctrine. The Commission argues that because "[t]his is a cost allocation case," the limitations surrounding retroactive rate changes do not come into play, and the remedy imposed here was otherwise within FERC's broad power to effectuate the FPA under Section 309. *See* Resp't's Br. 39-46. Because Section 206 contemplates surcharges in cost-allocation cases, FERC's orders here are within its remedial authority. And because FERC explained valid reasons for departing from its usual policy of denying reallocation, that departure was not arbitrary or capricious.

i.

Section 206 defines FERC's authority when an existing rate is found unjust, unreasonable, unduly discriminatory, or preferential. 16 U.S.C. § 824e. This includes two main tools at FERC's disposal. First, Section 206(a) authorizes FERC to "fix" rates prospectively, after it concludes that a rate is inappropriate upon a complaint by a market participant or on FERC's own impetus. *See id.* § 824e(a); *Xcel*, 815 F.3d at 950. Second, Section 206(b) permits FERC to order refunds where the previous rate was unfairly high, effectively setting the rate as of the date that the Section 206 proceeding began – either

15

when FERC instituted an investigation or the date of the complaint, if instigated by a third party. 16 U.S.C. § 824e(b). However, no concomitant authority exists to retroactively correct rates that were too low. *See Fed. Power Comm'n v. Sierra Pac. Power Co.*, 350 U.S. 348, 353 (1956) (noting that "[the Section 206] power is limited to prescribing the rate 'to be thereafter observed' and thus can effect no change prior to the date of the order"). This rule against retroactive rate increases precludes FERC from ordering remedies that accomplish a higher rate for a past period. In turn, the filed-rate doctrine requires market participants to abide by the rates set: "utilities are forbidden to charge any rate other than the one on file with the Commission." *W. Deptford Energy, LLC v. Fed. Energy Regulatory Comm'n*, 766 F.3d 10, 12 (D.C. Cir. 2014). The "rule against retroactive ratemaking" and the filed-rate doctrine may thus be understood as "corollar[ies]" that make static the rates paid for energy, once established. *NSTAR Elec. & Gas Corp. v. Fed. Energy Regulatory Comm'n*, 481 F.3d 794, 800 (D.C. Cir. 2007). *See also Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 (1981) (explaining the development of the filed-rate doctrine in the context of the Natural Gas Act).

While Section 206's limitations and the filed-rate doctrine thus restrict the remedies that FERC may order, FERC's remedial authority is otherwise expansive. Section 309 of the FPA provides that

> The Commission shall have power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of this chapter.

16

16 U.S.C. § 825h. Section 309 accordingly permits FERC to advance remedies not expressly provided by the FPA, as long as they are consistent with the Act. *See TNA Merch. Projects, Inc. v. Fed. Energy Regulatory Comm'n*, 857 F.3d 354, 359 (D.C. Cir. 2017) (citing *Niagara Mohawk Power Corp. v. Fed. Power Comm'n*, 379 F.2d 153, 158 (D.C. Cir. 1967)). This Court has endorsed FERC's authority under Section 309 to recoup erroneous refunds, *id.* at 362; *Canadian Ass'n of Petroleum Producers v. Fed. Energy Regulatory Comm'n*, 254 F.3d 289, 299-300 (D.C. Cir. 2001), to order refunds where the rate paid exceeds the filed rate, *see Towns of Concord, Norwood, & Wellesley, Mass. v. Fed. Energy Regulatory Comm'n*, 955 F.2d 67, 73 (D.C. Cir. 1992), and to imply a refund protection where the Commission erred in accepting a tariff revision that lacked such a commitment, *see Xcel*, 815 F.3d at 954-56. This variety of remedies indicates the expansive range afforded by FERC's Section 309 remedial power.

The reallocation of SSR costs, including through surcharges, is well within FERC's remedial authority under Section 309, read in harmony with Section 206 and the filed-rate doctrine. While the surcharges at issue here resulted in some customers paying more for past services than they were charged originally, that cost increase to a subgroup of ratepayers is not a "retroactive rate increase" as such: the aggregate rate remained the same, divided differently among the constituent payers. Although such a reallocation is not expressly contemplated under Section 206, subsection (c) confirms our interpretation by negative implication. Section 206(c) discusses "shifting costs" between utility companies within a registered holding company. The provision bars refunds in circumstances where "refunds . . . might otherwise be payable" but where the refund order "is based upon a determination that the amount of such decrease should be paid

17

through an increase in the costs to be paid by other electric utility companies of [the] registered holding company." 16 U.S.C. § 824e(c). This statement that surcharges to pay for refunds are impermissible in specific, limited circumstances contemplates that the converse is true in all other circumstances: surcharges to cover retroactive rate design changes are acceptable when those limited circumstances do not apply. Reading the Section 206(c) exception in conjunction with Section 206(b) and against the backdrop of Section 309, FERC's authority to order refunds thus must be understood to encompass surcharges to pay for ordered refunds where the result is a reallocation of an existing rate. Only that understanding gives meaning to the Section 206(c) carve-out prohibiting surcharge-funded refunds as between multiple utility companies within a single holding company. If FERC could not ordinarily order surcharge-funded refunds, the exception would be superfluous.

Petitioners rely heavily on this Court's decision in *City of Anaheim, California v. Federal Energy Regulatory Commission* to argue that surcharges are unlawful, but that decision is inapt. *See* 558 F.3d 521 (D.C. Cir. 2009). *City of Anaheim* involved a Section 206 complaint by wholesale electricity generators alleging that the FERC-approved rate for must-offer generation was too low. FERC agreed, ordered a rate increase, and applied it retroactively, with surcharges to make up the difference. We rejected FERC's action as an impermissible retroactive rate change: long-standing precedent holds that rate changes may be prospective only. *Id.* at 523-25. Because the rate change increased what customers paid during the past period of depressed rates, it made no difference that FERC ordered the higher rates through forward-looking surcharges. *City of Anaheim* thus stands for the unremarkable proposition that FERC cannot order through surcharges what it could not otherwise accomplish directly.

18

But reallocation is a different animal altogether, and the surcharges ordered here are part and parcel of that reallocation. As FERC explained in its September 22, 2016 Order, "*City of Anaheim* involved the Commission's direct imposition of retroactive surcharges to effectuate a rate increase," while in "the instant case [] the Commission has not changed the SSR rates." Sept. 22, 2016 Order, 156 FERC ¶ 61,205, P 48. Because FERC's remedial authority allows for rate reallocation, and Section 206(c) buttresses this understanding, FERC's use of surcharges to effectuate the reallocation is squarely within FERC's authority.

Petitioners also argue that the Section 309 cases relied upon by FERC in its September 22, 2016 Order are distinguishable as involving error by the Commission. Pet'rs' Br. 38; Pet'rs' Reply Br. 7-8 (citing *TNA*, 857 F.3d at 360). But Section 309 grants FERC broad remedial power regardless of whether a mistake by FERC creates a reason to use it. The provision itself allows for "any and all acts" "necessary or appropriate" to carry out the FPA's statutory ends, 16 U.S.C. § 825h, not merely to fix mistakes by the Commission. *See Niagara Mohawk*, 379 F.2d at 158 (explaining that the "necessary or appropriate" clause is "not restricted to procedural minutiae, and . . . authorize[s] an agency to use means of regulation not spelled out in detail, provided the agency's action conforms with the purposes and policies of Congress and does not contravene any terms of the Act"). And, as described above, this Court has validated FERC's Section 309 authority in myriad contexts, with and without a predicate error. Because Section 206 supports, rather than negates, FERC's authority to order rate reallocations, the statute does not restrict FERC's Section 309 authority for the remedy ordered here.

19

Finally, Petitioners invoke the *Chenery* doctrine. They claim that FERC's reliance on Section 309 in its brief "is an impermissible *post hoc* rationalization of counsel," since "FERC did not rely on FPA Section 309 below," and Intervenors' use of Section 206(c) to inform the interpretation of Section 206(a) and Section 309 similarly "is improper." Pet'rs' Reply Br. 2, 5-6, 11-12. *See Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (limiting a reviewing court to "the grounds invoked by the agency" when judging the "propriety" of a "determination or judgment which the administrative agency alone is authorized to make"). Neither of these arguments hold water. While FERC did not explicitly mention Section 309 in the challenged orders, it repeatedly cited *Niagara Mohawk*, a Section 309 case about the scope of permissible remedies, and *Xcel Energy*, a Section 309 case about refund commitments. *See, e.g.*, Escanaba Initial Order, 148 FERC ¶ 61,116, P 38 n.49; Feb. 19, 2015 Order, 150 FERC ¶ 61,104, P 90 n.220; Sept. 22, 2016 Order, 156 FERC ¶ 61,205, PP 49, 61 & n.126. By these references, FERC invoked its Section 309 authority, even if not by name. Moreover, Section 206(c) is only further textual support for the conclusion that Section 206(a) does not preclude and Section 309 affords FERC the remedial authority used here. *Chenery* poses no obstacle when we consider a party's interpretation of other statutory provisions to bolster the interpretation of the statutory language at issue. *See Am.'s Cmty. Bankers v. Fed. Deposit Ins. Corp.*, 200 F.3d 822, 835 (D.C. Cir. 2000).

ii.

Having established that FERC has the statutory authority to order a reallocation of SSR costs through refunds and surcharges, we next consider whether FERC acted within its discretion in doing so here. Petitioners argue that FERC previously "acknowledged that it has no authority to order

20

retroactive surcharges," making this action a departure from its ordinary policy. *See* Pet'rs' Br. 36. However, as Petitioners note, FERC consistently has construed its refund authority to be equitable and flexible, with appropriate remedies dictated by the circumstances. *Id.*

The circumstances here support FERC's decision to order refunds paid for by surcharges. In *Louisiana Public Service Commission v. Federal Energy Regulatory Commission*, a reallocation case like this one, this Court validated FERC's "previously muddled position" that "it has no generally applicable policy of granting refunds" where a rate has been unfairly allocated between multiple constituent payers, but "the utility has received no net over-recovery." 883 F.3d at 932. As the Court explained, FERC's "default position" with respect to reallocation refunds relies on two premises: that typically "it would be difficult for the utility to recover its costs fully" because "it would be difficult or inequitable to extract recompense" from customers that paid too little, and that "customer firms that had made operational decisions in reliance on one set of rates would be unable to 'undo' those transactions retroactively in light of the new, corrected rates." *Id.* at 933.

As FERC explained in the September 22, 2016 Order, neither of these circumstances are present here. First, there is no risk of "under-recovery" because "MISO has a record of the SSR costs paid by each LSE . . . and [] can calculate the exact amount of SSR costs that should be assessed to each LSE that underpaid in order to refund LSEs that overpaid" based on the revised methodology. Sept. 22, 2016 Order, 156 FERC ¶ 61,205, P 47. MISO's LSE customer population has not changed, so the calculation of over- and under-payments does not present any concern of inequitable recovery. Second, no challenger "identified any particular decisions made in reliance on the previous SSR cost allocation methodology." *Id.* at P 45.

21

While parties protesting the retroactive application of the changed rate design argued that the reallocation "create[d] market uncertainty" by disrupting "sellers' expectations," FERC concluded that because "SSR cost-allocation is an out-of-market process," "there are no markets involved, there is no undermining of those markets, nor is there previous market conduct that would have been adjusted to account for eventual refunds." *Id.* at P 46.  In other words, because the SSR costs cannot be avoided, changing rate design does not implicate market-reliance concerns.

FERC's rationale for distinguishing the reallocation at issue here is particularly compelling in light of the unique nature of the SSR agreements at issue.  Reliability resources are so designated because they are essential to the reliability of the system's energy supply, and SSR agreements are accomplished in short order so as to avoid any gap in coverage. As the Commission explained in its September 22, 2016 Order, SSR agreements "must go into effect quickly to ensure that the resource continues to operate," and without an agreement in place, a designated unit "would otherwise have provided SSR service on an uncompensated basis while the required Tariff process took its course."  Sept. 22, 2016 Order, 156 FERC ¶ 61,205, P 52.  In addition, MISO is a non-profit that itself lacks any funding to cover the costs of refunds to the LSEs that paid too much.  *See Wis. Pub. Power, Inc. v. Fed. Energy Regulatory Comm'n*, 493 F.3d 239, 245 (D.C. Cir. 2007). Accordingly, there was no over-recovery due to the pro rata methodology that would have resulted in a surplus in MISO's hands.  *See* Sept. 22, 2016 Order, 156 FERC ¶ 61,205, P 42 (discussing *La. Pub. Serv. Comm'n & the Council of the City of New Orleans*, 155 FERC ¶ 61,120 (Apr. 29, 2016)).  The only way that FERC's ordered refunds may be accomplished is by collecting the necessary funds from MISO's customers.  As the Commission reasoned, it is equitable that those customers

22

receiving a windfall from the pro rata methodology pay it back to effect the reallocation.

FERC's consideration of these "relevant, significant facts" distinguished its approach in this case from its usual policy and the precedent it set in other cases. *Cf. PG&E Gas Transmission, Nw. Corp. v. Fed. Energy Regulatory Comm'n*, 315 F.3d 383, 388-90 (D.C. Cir. 2003). Accordingly, we are satisfied that FERC's atypical remedy in this case reflects a reasoned decision-making process and was within the Commission's discretion.

\*   \*   \*

We thus deny the Petitions in full. FERC reasonably determined that the pro rata allocation of SSR costs in the ATC footprint was unjust and unreasonable, based upon substantial evidence. The ordered remedy of refunds funded by surcharges was within FERC's remedial authority under Sections 206 and 309 of the FPA, and FERC adequately explained its rationale in ordering that remedy here.